Exhibit 1

00-CV-2043-CM                                              1

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2

 3     WESTERN RESOURCES, INC.,        Docket No. 00-CV-2043-CM

 4       Plaintiff,                    Kansas City, Kansas
                                       Date: 7/23/02
 5       v.                            Time: 9:00 a.m.

 6     UNION PACIFIC RAILROAD CO.
       and
 7     THE BURLINGTON NORTHERN and
       SANTA FE RAILWAY CO.,
 8
         Defendants.
 9     .................

10                  DISPOSITIVE MOTIONS HEARING
              BEFORE THE HONORABLE CARLOS MURGUIA,
11                UNITED STATES DISTRICT JUDGE.

12
       APPEARANCES:
13
       For the Plaintiff:     A. Bradley Bodamer
14                            Alexis C. Noack
                              William E. Hanna
15                            Stinson Morrison Hecker LLP
                              2600 Grand Blvd.
16                            Kansas City, MO  64108-4606

17                            Frank J. Pergolizzi
                              Slover & Loftus
18                            1224 17th St, NW
                              Washington, DC 20036
19
       For the Defendant UP:  Harris Weinstein
20                            Jay T. Smith
                              Covington & Burling
21                            1201 Pennsylvania Ave, NW
                              PO Box 7566
22                            Washington, DC  20044

23                            James M. Yeretsky
                              Yeretsky & Maher, LLC
24                            South Creek Office Park
                              7200 W. 132nd St, Ste 330
25                            Overland Park, KS  66213
```

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

                    00-CV-2043-CM                         2

```
 1        APPEARANCES cont'd:
          For the Defendant BNSF:    Samuel M. Sipe, Jr.
 2                                   Steptoe & Johnson, LLP
                                     1330 Connecticut Ave, NW
 3                                   Washington, DC  20036

 4                                   Douglas R. Dalgleish
                                     Lathrop & Gage, LC
 5                                   2345 Grand Blvd
                                     Kansas City, MO  64108-2684
 6
          Court Reporter:           Nancy Moroney Wiss
 7                                   558 US Courthouse
                                     500 State Avenue
 8                                   Kansas City, KS  66101
                                     913-551-5646
 9
          Proceedings recorded by machine shorthand, transcript
10        produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                3

 1        THE COURT:  Let the record show we're in United

 2   States District Court for the district of Kansas.  We're

 3   here regarding Case Number 00-2043.  It's a case entitled

 4   Western Resources, Incorporated versus Union Pacific

 5   Railroad Company and the Burlington Northern and Santa Fe

 6   Railway Company.  Would the parties please enter their

 7   appearance?

 8        MR. BODAMER:  Your Honor, Brad Bodamer, Alexis

 9   Noack, and William Hanna of Stinson Morrison and Hecker

10   on behalf of the plaintiff Western Resources.  Also

11   present is Frank Pergolizzi of the Washington, DC firm of

12   Slover & Loftus.

13        MR. YERETSKY:  Your Honor, on behalf of the Union

14   Pacific, James Yeretsky of Yeretsky and Maher.  Craig

15   Leff is seated at the row behind counsel table.  I'd also

16   like to introduce, immediately to my left, Jay Smith of

17   the firm of Covington & Burling, and seated next to

18   Mr. Smith is Harris Weinstein, also of the firm of

19   Covington & Burling.  Mr. Weinstein, sir, will be making

20   the presentation on behalf of the Union Pacific today.

21        MR. DALGLEISH:  Good morning, Your Honor.

22        THE COURT:  Morning.  Before you begin--

23        MR. DALGLEISH:  I was going to do the rest of the

24   introductions.

25        THE COURT:  I'm sorry.  Go ahead.

Exhibit 1

00-CV-2043-CM                                              4

1          MR. DALGLEISH:  My name is Doug Dalgleish.  I'm

2     with the firm of Lathrop and Gage, for Burlington

3     Northern Santa Fe.   Present is Mr. Sam Sipe with the law

4     firm of Steptoe and Johnson.  He'll be arguing today.

5     Thank you, Your Honor.

6          THE COURT:  Sorry, Mr. Dalgleish.  All right.

7     Counsel, first of all, I want to thank you for being here

8     this morning on very short notice.  Apologize, we got a

9     little bit delayed this morning.  Appreciate you being

10    here on time.  Have a full schedule for this morning, and

11    I'm gonna ask for your cooperation in going over each one

12    of these items that I am gonna bring up with you.  To

13    start with, I'm gonna go over the schedule that we have,

14    at least at this point.  Today, we're gonna do a hearing

15    on dispositive motions that have been filed, some other

16    motions that the court's gonna identify to you.  Right

17    now, tentatively, we have scheduled August 7th, 8th, and

18    9th for Daubert hearings, and those hearings are to--

19    scheduled to begin at 9:30 in the morning.  In regards to

20    the August 9th date, I would let you know, there's a

21    possibility the court is not gonna be available on that

22    date.  That is still not certain, but I will let you know

23    that's a possibility.  August 15th and 16th are scheduled

24    for motion in limine hearings.  And those are at 9:30 in

25    the morning.  August 19th is when our trial is scheduled

Exhibit 1

00-CV-2043-CM                                            5

1    to begin at 1:30 in the morning (sic.).  In regards to

2    that trial setting, I know there's defendant's motion for

3    a continuance.  In regards to that motion and all the

4    pleadings that have been filed in this case, and the

5    court's gonna rule on, the court intends to issue several

6    rulings this morning, and I would tell you that most of

7    those rulings or some of those rulings the court believes

8    it can make a ruling without the benefit of any

9    additional argument.  There are some rulings, though, or

10   some of the motions the court is gonna ask specific

11   questions of counsel, and I would appreciate it if

12   counsel would directly answer those questions.  I'll ask

13   for arguments as I proceed with the court's own agenda,

14   and to start with, the first item the court would like to

15   take up is defendant's motion for continuance, which is

16   document 508.  I've read the pleading, I've read the

17   response.  At this time, the court is ready to rule in

18   regards to the motion for continuance.  Defendants asked

19   the court to continue the trial in this matter.  Having

20   considered the arguments set forth by the parties, and

21   considered the court's calendar and the availability of

22   the jury pool, the court denies defendants' motion.  The

23   schedule of the trial will be just as reviewed by the

24   court.  So, we're scheduled for trial starting on August

25   19th at 1:30 in the afternoon.  There are some

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                    6

1    dispositive motions that have been pending before this

2    court, and these are the ones the court is going to rule

3    on.  The first motion is gonna be defendants Union

4    Pacific and Burlington Northern Santa Fe's supplemental

5    motion for supplemental ruling in light of the June 26

6    order, which is document 506.  Second motion will be

7    defendants Union Pacific and Burlington Northern's motion

8    to strike plaintiff's jury demand for its contract

9    termination and restitution claims, which is document

10   310.  The next motion will be defendants Union Pacific

11   and Burlington Northern's motion for summary judgment,

12   dismissing all counts in plaintiff's first amended

13   complaint, which is document 341.  The last one will be

14   plaintiff Western Resources' motion for partial summary

15   judgment, which is document 344.  Is counsel clear on the

16   order in which we're gonna take up these motions?  At any

17   point, if counsel has a question in regards to what the

18   court is addressing or trying to explain a ruling on,

19   please feel free to let me know.  As the court is making

20   rulings on some of these motions and dispositive motions,

21   I'm gonna make my record here in court to start with, I'm

22   gonna set out what the court believes plaintiff's claims

23   are at this point.  In the amended complaint, plaintiff

24   raises three separate counts.  Number one, breach of rail

25   transportation agreements.  Number two, breach of

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                          7

1    obligation of good faith, and number three, restitution.

2    In its prayer for relief, plaintiff seeks, one, a

3    declaration that defendants have materially breached the

4    contracts.  Two, a declaration that plaintiff is excused

5    from further performance under the contracts from the

6    date of defendants' material breach.  Three, a

7    declaration that the contracts were void and are of no

8    further force and effect after the date of the material

9    breach.  Four, an award of damages at trial.  Five, an

10   award of restitution in the amount defendants were

11   unjustly enriched from the date of the material breach by

12   defendants.  And six, an award of costs, interests,

13   expenses, and other just relief.  As I mentioned, the

14   first motion is going to be defendants Union Pacific and

15   Burlington Northern Santa Fe's supplemental motion for

16   supplemental ruling in light of the June 26 order.  Court

17   believes that defendants' argument is that they are

18   moving the court to dismiss plaintiff's claim for quote,

19   retroactive contract termination and restitution for the

20   period following such termination, which is count three.

21   Defendants assert that count three is inconsistent with

22   plaintiff's initial claim for damages and plaintiff's

23   other decisive acts that affirm the contracts at issue in

24   this case.  The court has some questions it believes are

25   relevant to issues raised in the pending motion.  And the

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                          8

```
1      questions are the following.  I've broken these into two
2      different groups.  The first group consists of the
3      following questions.  What claims has plaintiff raised in
4      its complaint, amended complaint?  And specifically the
5      court would ask counsel to answer that question.  Number
6      two, what remedies has plaintiff requested, prayed for?
7      And number three, what remedy is sought for what claim?
8      Additionally, what periods of time are addressed by each
9      claim and requested remedy?  Again, I've read what's all
10     ready been pled and also response, but the court wanted
11     to have that specifically addressed by counsel.  And for
12     Western Resources, who is gonna be the--
13          MR. BODAMER:  Your Honor, Brad Bodamer.
14          THE COURT:  Okay.
15          MR. BODAMER:  You want me to answer those
16     questions?
17          THE COURT:  Please.
18          MR. BODAMER:  First question, what claims has
19     plaintiff raised in the complaint and the amended
20     complaint?  With respect to the complaint, in essence,
21     and I say essence, summarizing, Western Resources sought
22     or claimed that the railroads had materially breached the
23     contracts at issue, 2801, 2802, and sought termination of
24     those contracts and sought damages as a result of the
25     breach.  With respect to the amended complaint, basically
```

Exhibit 1

00-CV-2043-CM                                    9

1    the same issues, except it was asserted as a separate

2    count three, that the-- again-- material breach and

3    termination of the contract, specifically referencing

4    from and after the date of the material breach, which we

5    allege is April of 1997, or began in April of 1997 and

6    continued even to this day.  Would you like for me just

7    to proceed with each one or--

8          THE COURT:  Yes.

9          MR. BODAMER:  Did you have questions in response

10   to-- okay.  What remedies-- second question you ask, what

11   remedies are requested?  Western recognizes that it

12   cannot make a double recovery here.  It cannot both

13   affirm and disaffirm a contract.  We recognize that.  But

14   we also believe that we're entitled to seek alternative

15   claims and alternative remedies under the procedural

16   rules of the state of Kansas and the federal rules, and

17   with respect to the claim of material breach, which if

18   this court or jury finds there's been material breach, we

19   believe we're entitled to termination as of the date of

20   the material breach; it would be April of 1997.  And if

21   the court or jury determines that the contract was

22   terminated as of that date, then, the essence of our

23   complaint is we have been overpaying since April of 1997

24   by paying the contract rate, which it's our allegation

25   that the contract rate is far in excess of the reasonable

Exhibit 1

00-CV-2043-CM                                            10

1     value of the services rendered.  Again, what's that

2     recognize?  It recognizes that in the event that the

3     contract is terminated as of April 1997, we have

4     continued to receive transportation service from the

5     railroad; the court's aware of that.  We're not

6     contending that the railroads are entitled to zero or

7     nothing for the services that they rendered.  We're

8     simply alleging that what they're entitled to is the

9     reasonable value of those services as opposed to the

10    contract rate, which is nearly double.  Item number

11    three-- excuse me, maybe I haven't fully addressed that.

12    So, if there's a material breach, if the court determines

13    that the contract's terminated as of April 1997, we

14    believe under the remedy at restitution or unjust

15    enrichment, that we're entitled to money back.  In the

16    event the court determines it's not a material breach,

17    jury determines it's not a material breach, it's simply a

18    breach, we would be entitled to our compensatory damages

19    that were incurred as a result of the railroads' breach.

20    Number three, what remedy is sought for what claim?

21    Well, maybe I've all ready addressed that, but again, the

22    remedy of restitution in the event of a finding of

23    material breach and termination; compensatory damages, in

24    the event the court determines-- court or jury determines

25    that no material breach, no termination, no entitlement

Exhibit 1

00-CV-2043-CM                                        11

```
 1     to restitution, then clearly we've been damaged, and we'd

 2     be entitled to our compensatory damages for this-- for

 3     the breach.  Number four, what period of time was

 4     addressed for each, or is addressed for each?  The-- as

 5     we've alleged, the material breach began in April of

 6     1997, and has continued to this day.  But as far as the

 7     restitution claim, if we're correct and it was April 1997

 8     or some date after that, then the restitution claim would

 9     be from the date that the court or jury determines

10     there's been a termination up until the present time,

11     'cause we continue to pay at the contract's rate to this

12     day.  With respect to the compensatory damage claim, the

13     alternative claim, beginning in 1997, April of 1997,

14     really continuing through 1998, there was a serious

15     deficiency in service resulting in four or five different

16     categories of damages that incurred throughout that

17     period of time.  Service improved in 1999, but even

18     during that improvement of service, it's Western's

19     contention that we continued to receive inefficient

20     service and that we were required to put in service more

21     train sets than we should be required to place in service

22     under the contract, and therefore, that would be an item

23     of damage that would continue during that-- even during

24     that period of time, and then there was a return to

25     deficient service in 2001, again Western went into coal
```

Exhibit 1

00-CV-2043-CM                                    12

```
1      conservation, which means cut down on production
2      starting-- seeking alternative, or excuse me, went into
3      conservation and reduced its production, and we're
4      seeking damages for the 2001 period as well.  I believe
5      I've addressed your questions.  Do you have any --
6           THE COURT:  I have two follow-up, yes.
7           MR. BODAMER:  Yes, sir.
8           THE COURT:  At what point does the plaintiff
9      believes it's required to elect its remedy, and is there
10     the availability, and through what authority for this
11     partial recision that the plaintiff is requesting?
12          MR. BODAMER:  We're not seeking partial recision.
13     We're seeking-- and I realize the railroads-- that's the
14     way they phrased it.  What we're seeking is the remedy of
15     termination, not recision, which would be retroactive to
16     the date of the contract in 1994, but termination as of
17     April of 1997.  Termination as a result of a material
18     breach, and the authorities, I think are clear, that in
19     the event of a material breach, it does excuse
20     performance, and that's what we're contending.
21          THE COURT:  Thank you.
22          MR. BODAMER:  Is that it?
23          THE COURT:  Yes, at this point.  Defendant, Mr.
24     Weinstein, is that correct?
25          MR. WEINSTEIN:  Yes, good morning, Your Honor.
```

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                    13

1          THE COURT:  Good morning.

2          MR. WEINSTEIN:  May it please the court, if I may

3     take first the-- what I believe was the final question

4     that you put to Mr. Bodamer.  Railroads, the defendants,

5     do not understand what the request for relief in the

6     amended complaint as to count three of the amended

7     complaint could be, if it is not something in the area of

8     restitution.  The only three remedies allowed for breach

9     of contracts are recision and restitution, compensatory

10    damages, and specific performance.  The kind of

11    termination that is being-- that Mr. Bodamer was speaking

12    of on behalf of the plaintiff is a forward looking remedy

13    associated with a material breach of contract, but it's

14    not a retroactive remedy under the law, and to turn to

15    the questions that Your Honor put to counsel a few

16    moments ago, we think that the difference between the two

17    complaints is found in the addition of count three in the

18    amended complaint, headed restitution.  There is nothing

19    like that in the original complaint, and that is what is

20    entirely new.  In addition, the prayer for relief has

21    been changed in a legally significant way, and a-- and in

22    a dramatically, significant way, when the plaintiff has

23    gone from the original complaint to the amended

24    complaint.  In the original complaint, the plaintiff, I

25    believe, phrased its prayer for relief, paragraph little

Exhibit 1

00-CV-2043-CM                                        14

1       A, in what we would suggest is the normal way for a party

2       who comes into court, declares there's a-- been a

3       material breach of contract, and claims freedom from

4       further performance.  It says that-- it asks that the

5       court declare a material breach, and that Western

6       Resources is excused from further performance under the

7       contracts, and the contracts are void, and are of no

8       further force and effect.  That's quite standard in a

9       case that asserts a material breach.  The Fusion case in

10      this court decided by Judge Lungstrom a couple of years

11      ago is an example of a case where a party comes in and

12      says, as of a specified date, the other side is in

13      material breach, and from that date forward we should be

14      excused from performance.  Now, what is new in the

15      amended complaint and for which we suggest there is no

16      legal precedent whatever, is the change in paragraph A of

17      the prayer for relief to put in the statement that the

18      contracts were void and are of no further force or effect

19      after the date of the material breach, coupled with the

20      factual allegations under the new count three, which are

21      found essentially in paragraphs 57 through 60, which

22      assert now instead of the claim for future relief from

23      the obligations of the contract, which was the gravamen

24      of paragraph A of the prayer for relief in the original

25      complaint, incorporates here in these paragraphs, 57

Exhibit 1

00-CV-2043-CM                                        15

1       through 60 together with the new prayer for relief, A,

2       the demand for partial retroactive recision, coupled with

3       restitution of close to half of the amounts that had been

4       paid for transportation services since April 1997.  And I

5       believe that that answers Your Honor's question.  If I--

6       or series of questions.  If I may comment very briefly on

7       Mr. Bodamer's suggestion that changes in pleadings rules

8       in Kansas permitted the defendant, I'm sorry, the

9       plaintiff, to pursue these inconsistent remedies in the

10      way they have, by complaint and amended complaint,

11      coupled with all the actions that we put into our motion

12      for supplemental ruling, the actions since late 1999,

13      which specifically come out of the contract and are

14      viewed, constitute further reaffirmance of the contract.

15      The affirmance/disaffirmance rule is a substantive rule

16      of contract.  It is not one that is overcome by changes

17      in pleadings rule.  In fact, we would point out to the

18      court that the Lehigh case which comes after the 1964

19      change in the procedural rules in Kansas and on which the

20      plaintiff relies in opposing our motion for supplemental

21      ruling, relies entirely on a case called Lindsey v.

22      Keiming, K-E-I-M-I-N-G, which was decided in Kansas

23      before the change in procedural rules.  So, those changes

24      in procedural rules have nothing to do with the substance

25      here.  The substance we suggest remains, that if a party

Exhibit 1

00-CV-2043-CM                                    16

1    with full knowledge of the facts, as Western had when it

2    filed its case in January of 2000, files a pleading

3    seeking only prospective relief under a theory of

4    material breach, which is what the original complaint

5    did, then it has made its selection to affirm the

6    contract, and it cannot subsequently come in with a

7    changed complaint and seek to disaffirm the contract by

8    claiming this form of partial recision and restitution,

9    Your Honor.

10         THE COURT:  Thank you.  The court is ready to rule

11   in regards to this motion.  The court rules in the

12   following manner.  Again, after consideration of the

13   arguments raised in the pleadings as well as what's been

14   supplemented here at our hearing, the court finds that

15   plaintiff's complaint raises a claim for breach of

16   contract which includes breach of good faith claim.  The

17   court further finds plaintiff has requested the following

18   remedies:  Number one, damages.  Number two, partial

19   recision of contract as of date of the breach.  And

20   number three, restitution.  I know, Mr. Bodamer, you said

21   that you're not requesting partial recision.  The court's

22   still gonna make a ruling in regards to that, because it

23   believes that part of that, or the partial recision was

24   at least raised in the pleadings, and it's been addressed

25   here as well by counsel, defendants' counsel.  The court

Exhibit 1

00-CV-2043-CM                                        17

1       finds that partial recision is unavailable under Kansas

2       state law.  Kansas law clearly holds that a recision must

3       be total rather than partial.  A party to a contract may

4       not quote, affirm in part and repudiate in part, end

5       quote, nor can a party to a contract, quote, claim or

6       retain advantages under the contract and evade its

7       disadvantages, end quote, and that's from Dutton versus

8       Dutton, 113 Kansas 146.  Moreover, where recision of a

9       contract is requested, quote, it must be rescinded in

10      total, if at all, end quote, in the same case.  Moreover,

11      it is questionable whether the typical remedy for

12      recision is available in this case.  That is, it is

13      questionable whether given the length of performance

14      under the contracts, the parties may, quote, be placed in

15      substantially the same condition as they were in when the

16      contracts were executed, end quote.  And that's from a

17      case of M & W Development, Incorporated versus El Paso

18      Water Company, at 634 Pacific 2nd, 166.  Therefore, the

19      court finds that plaintiff has elected the remedy of

20      damages for the alleged breach of contract at issue here.

21      Accordingly, defendants' motion for supplemental ruling

22      is granted in part, as noted on the record.  Next matter

23      is defendants Union Pacific and Burlington Northern's

24      motion to strike plaintiff's jury demand for its contract

25      termination and restitution claims.  Again, the court

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                          18

```
1     has, prior to this hearing, reviewed the pleadings that

2     were filed in this matter.  I've also reviewed what the

3     court believes to be the applicable law.  The court's

4     ready to rule.  Based on the court's ruling that's just

5     been made that plaintiff has elected the remedy of

6     damages, the court finds the issues raised in this motion

7     are moot.  First, as noted, the court finds plaintiff may

8     not seek a remedy of partial recision under Kansas law.

9     Therefore, whether plaintiff is entitled to a jury trial

10    on that claim is moot.  Second, the court believes that

11    based on its rulings, the amounts prayed for in

12    plaintiff's complaint as restitution are actually

13    available to plaintiff, if proved as damages, based on an

14    unjust enrichment quantum meruit theory.  And the court

15    would note that the case of Sharman versus Webber Supply

16    Company at 201 Kansas 507, held that compensation based

17    on the doctrine of quantum meruit is allowable for

18    partial performance, but the terms of the contract must

19    be taken into account, and the amount of recovery must be

20    based on the benefits conferred on the other party to the

21    contract, less a proper set-off for whatever damages may

22    have been sustained by the other party by reason of the

23    breaching party's failure to complete the contract.

24    There's also a case of Fritts versus Quinton,

25    Q-U-I-N-T-O-N at 118 Kansas 111, holding that
```

Exhibit 1

00-CV-2043-CM                                    19

1       compensation on quantum meruit was allowable for the

2       partial performance of personal services, but the terms

3       of the contract must be taken into account, and the

4       amount of recovery must be based on the benefits

5       conferred on the other party to the contract, less any

6       damages sustained by such other party by reason of the

7       breach of contract.  Plaintiff has a right to a jury on

8       these claims for damages as contemplated in the Pattern

9       Instructions in Kansas, section 124.17.  Defendants'

10      motion to strike is denied.  Next motion is defendants

11      Union Pacific and Burlington Northern's motion for

12      summary judgment dismissing all counts in plaintiff's

13      first amended complaint, which is document 341.

14      Defendant seeks summary judgment on all three of

15      plaintiff's claims.  First, defendants contend that the

16      uncontroverted facts established no breach of the

17      relevant agreement occurred.  Second, defendants contend

18      they are entitled to judgment as a matter of law on

19      plaintiff's breach of the obligation of good faith claim,

20      because Kansas law does not recognize a separate cause of

21      action as captioned by plaintiff.  Finally, defendants

22      contend they are entitled to summary judgment on

23      plaintiff's restitution claim, because plaintiff cannot

24      establish entitlement to recision, restitution, because

25      no material breach occurred, and because the claim is

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                          20

```
1     barred by a doctrine of agreed equivalence and by

2     implied, in fact, contract principles.  In regards to the

3     breach of contract claim which the court is gonna take up

4     first, let me again make a record that the court believes

5     defendants are contending that they are entitled to

6     summary judgment on plaintiff's breach of contract claim

7     because the uncontroverted facts establish no breach

8     occurred.  Specifically, defendants contend, number one,

9     no cycle time or other timeliness standard was

10    contemplated in the contract.  Number two, the contract

11    does not require defendants to transport all of

12    plaintiff's coal requirements to JEC.  Number three, that

13    the contract does not limit the number of trains or rail

14    cars that plaintiff may need to supply.  And number four,

15    that the contracts prefatory, quote, whereas, end quote,

16    clause imposes no obligations on defendants.  Moreover,

17    defendants contend that because the contract contains an

18    integration clause, the contract constitutes the entire

19    agreement between the parties.  Accordingly, defendants

20    argue that under the explicit terms of the agreement,

21    they were not obligated to perform the actions that

22    plaintiff claims constituted breach of the agreement.  In

23    regards to integration, the court rules in the following

24    manner.  Again, I'm familiar with the arguments that were

25    raised by counsel in their pleadings, and the court
```

Exhibit 1

00-CV-2043-CM                                        21

1      believes it's ready to rule.  First, the court finds that

2      the contract at issue is fully integrated within the

3      meaning of the Kansas parole evidence rule.  That's

4      Kansas Statute Annotated section 84-2-202.  Defendants'

5      motion is granted to the extent it seeks a ruling

6      regarding integration.  Article 22 of the agreement

7      specifies, this agreement compromises the entire

8      agreement, merging and superseding all prior

9      understandings and representations between shipper and

10     railroads regarding the subject matter of this agreement.

11     No subsequent agreement amending, supplementing,

12     modifying, or terminating this agreement shall be binding

13     on the railroads or shipper, unless it is in writing and

14     executed by the respective authorized representatives,

15     and to the extent required by applicable regulations

16     filed with and approved by the ICC, in accordance with 49

17     U.S.C. Section 10713, as amended from time to time.  And

18     that's from contract ICC-BN-C-2801 at Article 22.

19     Accordingly, by the contract's expressed terms, the

20     contract constituted the entire understanding between the

21     parties.  Moreover, the court may consider when

22     determining whether the parties intended the agreement to

23     be their final, complete agreement, quote, whether the

24     parties involved are merchants who had equal bargaining

25     power with respect to the subject matter of their

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                    22

1        transaction, end quote.  And that's from a case of Ray

2        Martin Painting versus Ameron, Inc. at 638 Fed. Supp.

3        768.  In this case, the evidence, when construed in the

4        light most favorable to the plaintiff as the non-moving

5        party, establishes that both plaintiff and defendants

6        were experienced in negotiating agreements regarding the

7        transportation of coal by rail, and were represented by

8        counsel during at least part of the negotiations leading

9        up to the execution of the agreement.  In addition, the

10       negotiations were not hurried, as the current agreement

11       was the culmination of over several years of negotiations

12       between the parties.  Court-- courts, quote, are less

13       reluctant to hold educated businessmen to the terms of

14       contracts to which they have entered-- entered than

15       consumers dealing with skilled corporate sellers, end

16       quote.  That's from Univeral Drilling Company versus

17       Camay Drilling Company at 737 Fed. 2nd, 869.  Given the

18       presence of the integration clauses in this extensively

19       negotiated agreement, and recognizing the sophistication

20       of the parties, the court finds as a matter of law that

21       the parties intended the agreement to be final and

22       exhaustive.  Accordingly, the court must construe the

23       contract's terms as written, rather than referencing

24       extrinsic evidence to determine the parties' intent as to

25       the contract's terms and obligations.  However-- and that

Exhibit 1

00-CV-2043-CM                                       23

1       was from Kansas Statute Annotated, section 84-2-202.

2       However, where necessary in such interpretation, the

3       common law rules regarding exceptions to the parole

4       evidence rule shall apply.  And that's from section

5       84-2-202, comment number four, noting, quote, the

6       traditional common law exceptions to the parole evidence

7       rule continue to apply, end quote, under statutory

8       provision regarding parole evidence.  In regards to the

9       effect of the prefatory clause, the whereas clause, the

10      court rules again, after considering your pleadings.  As

11      a matter of law, the court would find the defendant's

12      motion for summary judgment is granted, to the extent it

13      asks the court to find no independent obligation is

14      created by the fourth quote, whereas, end quote, clause

15      at issue here.  However, the motion is denied to the

16      extent it seeks court to find no timing or efficiency

17      standard is imposed by contracts as a whole, based on an

18      examination of this whereas clause.  The fourth whereas

19      clause at issue here provides quote, whereas the parties

20      further desire that the contractual arrangement promote

21      maximum equipment utilization and efficiency, end quote.

22      Plaintiff appears to contend that this provision either--

23      either alone or all read in conjunction with other

24      operative parties of the contract, imposes a timeliness

25      standard on the parties' contracted obligation.  The

Exhibit 1

00-CV-2043-CM                                                  24

```
 1    court agrees with defendants that considered in

 2    isolation, this whereas clause creates no independent

 3    obligation upon the parties.  However, when determining

 4    the parties' intent, quote, all the language used

 5    anywhere in the instrument should be taken into

 6    consideration and construed in harmony with other

 7    provisions of the contract, end quote.  That's from the

 8    case of Texaco, Inc. at 336 Fed. 2nd at 233.

 9    Accordingly, the court finds that this provision may be--

10    may be considered when interpreting other operative

11    provisions of the contract.  However, the court notes

12    that it is the granting clause, not the whereas clause,

13    that is quote, paramount in determining what interest was

14    intended to be granted, end quote, by the contract.

15    That's from Lathrop versus Eyestone, 170 Kansas 419.

16    Accordingly, end quote-- beginning quote, where there is

17    a conflict between specific provision and a general

18    provision, preference is given to the specific provision,

19    end quote.  That's from Amoco Production Company versus

20    Wilson, JR, Inc., at 266 Kansas 1084.  The court is going

21    to request arguments on the next part of this, which has

22    to do with the contract construction.  Specifically,

23    regarding construction of specific contract terms,

24    defendants' argument, as noted, defendant asks the court

25    to find as a matter of law, number one-- this is
```

Exhibit 1

00-CV-2043-CM                                    25

1       important, counsel, put these in order-- number one, that

2       no cycle time or other timeliness standard was

3       contemplated in the contract.  Number two, that the

4       contract does not require defendants to transport all of

5       plaintiff's coal requirements to JEC.  Number three, that

6       the contract does not limit the number of trains or rail

7       cars that plaintiff may need to supply.  Defendants then

8       ask the court to find under this interpretation of the

9       agreement, the uncontroverted facts establish no breach

10      occurred as alleged by plaintiff.  Because the

11      construction of a written instrument is a question of

12      law, it is the court's responsibility to construe the

13      terms of the contracts at issue here.  To assist the

14      court with that task, the court would like to hear

15      arguments regarding the disputed terms, the ones the

16      court has just identified as one, two, and three.

17      Specifically, the court would like for each party to

18      answer, with respect to the three disputed terms raised

19      by defendants' pending motion, the following questions.

20      And the questions for each of the disputed contract terms

21      are:  Number one, what is the relevant contract language

22      the court must consider?  Number two, does this relevant

23      language make this contract term ambiguous or

24      unambiguous?  And if it is ambiguous, what, if any, is

25      relevant extrinsic evidence that the court should

Exhibit 1

00-CV-2043-CM                                        26

1    consider to construe this term?  Number three, what is

2    the proper construction of the disputed contract term?

3    In regards to the first one, which again had to do with

4    the cycle time or timeliness standard, the second one had

5    to do with the allegation the contract does not require

6    defendants to transport all of plaintiff's coal

7    requirements.  Number three, that the contract does not

8    limit the number of trains or rail cars.  Those three

9    questions are the ones the court would ask on each one of

10   those disputed areas.  Start with defendant.  Mr. Wein--

11   I'm sorry, Mr. Sipe.

12        MR. SIPE:  Morning, Your Honor, Sam Sipe.

13        THE COURT:  Yes.

14        MR. SIPE:  The contract, I'm sure you're quite

15   familiar with, and it's marked as Exhibit 19 to our

16   motion, and I'm going to be referring to specific

17   provisions, and I may, in one or two instances, put up a

18   board that has some excerpts from the contract language.

19   First of all, no cycle time or other timeliness standard,

20   and the first question there is to point to specific

21   contract language that we rely upon.  We rely, Your

22   Honor, on Article 5 B of the contract, which is found at

23   page 15, I believe, captioned train cycle time and

24   tonnage.  Not later than each November 1 during the term

25   of this agreement, railroad shall provide to shipper its

Exhibit 1

00-CV-2043-CM                                    27

1    non-binding projected cycle times for the next calendar

2    year by month, for trains moved pursuant to this

3    agreement.  By expressly stating that the cycle time

4    furnished from the defendants railroads to Western is

5    non-binding, the contract eschews a cycle time standard.

6    And there is no other provision of this agreement from

7    which such a standard can be determined, and I'm not

8    gonna take the court through every other-- obviously

9    every other section of the agreement.  Western hasn't

10   pointed to one.  Now, would you like me to address each

11   of your three questions that relate first to this no

12   cycle time standard?

13        THE COURT:  Yes.

14        MR. SIPE:  Or would you-- okay, and then I'll go on

15   to the requirements as a second set.

16        THE COURT:  Please.

17        MR. SIPE:  Is this language ambiguous or

18   unambiguous?  It's unambiguous, Your Honor.  The

19   plaintiffs have acknowledged in their pleadings related

20   to the summary judgment motions that the contract is

21   unambiguous.  They've not attempted to point out any

22   ambiguity with respect to this provision, or any other

23   provision that I'm aware of.  And I don't think there's a

24   dispute between the parties on this.  What is the proper

25   construction of the term that I've just referred to?

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                              28

1     That's your third question, Your Honor?

2           THE COURT:  Yes.

3           MR. SIPE:  The proper construction is that the

4     parties agreed that for planning purposes, the railroads

5     would tell Western approximately how long they

6     anticipated it would take trains to complete a round trip

7     cycle in the next calendar year.  But the railroads were

8     not making any commitment to cycle the trains within a

9     particular period of time.

10          THE COURT:  Okay.

11          MR. SIPE:  And I believe that responds to all of

12    the questions on the first point.

13          THE COURT:  Thank you.

14          MR. SIPE:  No requirements-- the first question

15    here is, what is the relevant language in the contract to

16    establish our proposition that the railroads have no

17    obligation to transport Western's requirements to the

18    Jeffrey Energy Center?  Well, there is no provision in

19    the contract that specifically refers to requirements.

20    Therefore, once again, and this is a little bit like

21    trying to prove a negative, I can't take you through the

22    agreement and show you, it would be a waste of all of our

23    times to show you every provision of the agreement that

24    fails to say anything about transporting the railroads'

25    requirements.  But what I can show you is an excerpt from

Exhibit 1

00-CV-2043-CM                                              29

1    two of the key provisions here, which state the

2    railroads' version of what their obligation is.  It's not

3    to transport Western's requirements.  The obligation--

4    let me turn this so the court can-- can see it.  Is that

5    clear?  Can you see it, Mr. Bodamer?

6          MR. BODAMER:  I'll move over.

7          MR. SIPE:  The obligation is not to transport

8    requirements.  The railroads' obligation is to transport

9    all coal loaded in rail cars and tendered by shipper at

10   origins, and to deliver those loaded rail cars to

11   destination.  That's Article 3 A, and what we've

12   indicated on the board here is that Article 5 A 1, which

13   Western seems to have relied on for inferring the

14   requirements obligation, is totally consistent with

15   Article 3 A.  Both these form-- under both these

16   formulations, 3 A and 5 A 1, railroads shall transport

17   all the coal Western loads in rail cars at origins.

18   Railroads have no obligation to transport any coal that

19   is not loaded in rail cars.  And that is the essence of

20   our obligation, and it's the essence of our response on

21   the requirements issue.  Is this language ambiguous or

22   unambiguous?  It's unambiguous, Your Honor.  Western has

23   not questioned the meaning or significance of any of the

24   terms in either of these provisions.  They say in one of

25   their papers that we ignore section 5 A 1, but we clearly

Exhibit 1

00-CV-2043-CM                                    30

1      don't ignore section 5 A 1.  And finally, the third

2      question on this point, what is the proper construction

3      of the adopted term?  The proper construction is that the

4      railroads transport all the coal that Western loads at

5      the origins.  Western is responsible for loading the

6      trains.  That responsibility is found, I believe, in

7      Article 6 C.  When Western loads the trains, the trains

8      are tendered to the railroads, and the railroads

9      transport them to Jeffrey.  How does Western get the coal

10     it needs?  It gets the coal it needs by putting in the

11     number of train sets it thinks is needed to do the job

12     under the circumstances.  And over the life of the

13     contract, given Western's needs at Jeffrey, and given the

14     railroads' varying cycle times, Western has put in train

15     sets ranging in number from 5 to 12, and I think the way

16     to think about the way this contract is structured, Your

17     Honor, is that Western does have a means of controlling

18     the flow to Jeffrey.  It is a valve that is not the most

19     precise valve that Western could have bargained for, but

20     they didn't want to bargain for a cycle time standard, as

21     we've all ready seen, and so, they bargained for a

22     mechanism that allows them to control the amount of coal

23     they get by the number of trains they put into the

24     contract.  And that leads directly to the final question

25     that you had, which is, final series of questions, no

Exhibit 1

00-CV-2043-CM                                          31

1      limit-- railroads contend that there is no limit on the

2      number of trains that Western must supply.  And the

3      provisions of the contract we rely on, Your Honor, are

4      Article 4 A 1, at page 6 of contract 2801.  Shipper shall

5      furnish sufficient rail cars, including spares, to

6      assemble trains of 115 rail cars for shipments under this

7      agreement at no charge to railroads, except as otherwise

8      provided in this agreement.  And I would also direct the

9      court's attention to Article 6 A of this agreement.  If

10     shipper provides sufficient empty shipper supplied rail

11     cars to railroads, railroads shall assemble trains of not

12     less than 115 cars for movement to and loading at

13     origins.  There's no limitation on the number of trains

14     that Western is to furnish or that the railroads are to

15     accept into service under either of these provisions,

16     Your Honor.  Clearly, it would have been possible for the

17     parties to insert a numerical limitation of some sort.

18     But there is none.  And as I said, in practice, the

19     number of train sets has varied from 5 to 12 over the

20     course of this contract.  Is this language unambiguous or

21     ambiguous?  Again, it's unambiguous.  We don't believe

22     Western has argued to the contrary.  And finally, what is

23     the proper construction of the two provisions I've just

24     referred you to here?  The proper construction is that

25     Western is responsible for putting train sets into

Exhibit 1

00-CV-2043-CM                                          32

1        service.  That's how it controls the amount of coal it

2        gets, and there's no limitation on the number of train

3        sets Western is required to put into service or the

4        number that the railroads should accept, if Western

5        tenders those train sets.  I believe I've addressed the

6        court's questions, but if you have any follow-ups, I'd be

7        happy to try to answer them.

8               THE COURT:  Thank you.  Is that Mr. Bodamer?

9               MR. BODAMER:  Yes, sir.

10              THE COURT:  Is that correct?

11              MR. BODAMER:  If I might, could I ask the court a

12       question as to the court's appreciation for the practical

13       operations of the subject matter in this contract?  And

14       again, I don't-- I want to address your questions, but

15       I-- coming into this case within the last year and not

16       knowing anything about how this worked, I got off on all

17       kinds of detours, and I don't know if I can-- and I'm

18       not-- I'm hopeful you haven't gotten off on any of those,

19       but to the extent it might be helpful, I thought I could

20       just cover a couple of items.

21              THE COURT:  You can.  I would tell you that I am

22       pretty familiar all ready with what's before the court,

23       but if it's gonna help you make a record or maybe lead

24       into addressing what the court's brought up, then feel

25       free to do so.

Exhibit 1

00-CV-2043-CM                                              33

1          MR. BODAMER:  Okay.  And this really does tie in to

2     the first question about, you know, is there a specific

3     cycle time standard or other timeliness requirements?

4     And let me address that.  Is there a specific cycle time

5     standard?  In other words, do they-- do they have to

6     cycle these trains between the mines in Wyoming to

7     Jeffrey Energy Center and back to the mines in 90 hours

8     or 95 hours or 100 hours, does a contract say that?  No,

9     it does not say that.  Does that mean there is no

10     timeliness obligation whatsoever?  And I say that's

11     ludicrous to suggest that.  It would result-- it would

12     result in an absurdity, which this court knows is to be

13     discouraged in interpreting a contract, and it would in

14     effect render the contract illusory, 'cause there would

15     be no obligation, because the railroads would have in

16     their total control the amount of coal that they were

17     gonna ship, because they could simply avoid or prevent us

18     from receiving the coal we need, by either delaying the

19     loaded trains from the mines to Jeffrey Energy Center, or

20     delaying or stopping the return of the empty cars or

21     trains back to the mines.  And that-- and that leads me

22     to what's really going on here.  I mean, this plant was

23     built in 1978.  First contract between these parties or

24     some of these parties was entered into in 1972, and the

25     10th Circuit discusses this, you know, in the KPL, our

Exhibit 1

00-CV-2043-CM                                        34

1        predecessor, versus BN case, the parties both were

2        interested in developing the Powder River Basin.  We

3        needed-- we were gonna build a plant that would use this

4        high energy, low sulphur coal.  The place you find that

5        is in the Powder River Basin, and railroads were

6        interested in getting that business.  There was mutual

7        interest in establishing a relationship, and that was

8        done.  And for fifteen years, between 1978 and 1993,

9        these trains cycled between the Powder River Basin and

10       Jeffrey Energy Center and back to the Powder River Basin.

11       And they did that in a cycle.  That's where this whole

12       idea of cycle time comes up.  Now, also, I think it's

13       worth reminding the court, there's only one source of

14       coal that's burned at Jeffrey Energy Center, and that's

15       the Powder River Basin, and there's only one source of

16       transportation for that coal, and that's either the BN or

17       the UP or some combination of both, and as you know,

18       under these contracts, it is a joint move.  Now, this

19       contract required the-- the-- Western to ship and for the

20       railroads to transport 6 million-- either the greater of

21       6 million tons or 100 percent of all coal shipped from

22       the Powder River Basin to Jeffrey Energy Center.  Note

23       that there's a minimum there, but no maximum.  It was an

24       unlimited obligation.  Neither the railroads nor Jeffrey

25       knew exactly how much coal they would be needing or would

Exhibit 1

00-CV-2043-CM                                     35

1       be shipping under this agreement.  Now, is there a

2       timeliness standard?  And the answer to that question is,

3       yes.  Upon what do we base that?  What are the relevant

4       con-- what is the relevant contract language that the

5       court must consider?  I'll start with 5 A, which is what

6       I just referred to.  The minimum annual volume, and note

7       that the railroads talk about Article 3-- excuse me-- 3

8       A, to support their argument that all they're obligated

9       to do-- to transport is what's loaded in rail cars and

10      tendered by shipper at origins.  But please note that

11      Article 3 really deals with the nature of the service or

12      how those services are gonna be provided.  It deals with

13      the transportation of the loaded cars, the return of the

14      empties, and the routes that are gonna take place.  But

15      if you look at Article 5, 5 A, shippers volume

16      commitments, and 5 A, the minimum annual volume, that

17      deals, really, with how many-- what's the quantity that's

18      gonna be shipped here.  And again, there's a minimum but

19      no maximum.  It's an unlimited obligation, at least in

20      the specific terms of the contract, not unlimited in the

21      sense that, as the court's aware in the requirements

22      situation, there is some obligation in good faith on the

23      part of Western to ship its requirements and no more than

24      its requirements.  The other provision the court should

25      look at is Article 4 A, rail car supply.  Shipper shall

Exhibit 1

00-CV-2043-CM                                    36

1      furnish sufficient rail cars-- it's not specific as to

2      how many rail cars, it says sufficient rail cars-- to

3      assemble trains of 115 rail cars for shipments.  And so

4      the court's aware, these trains-- this was the minimum.

5      The standard was about 119 cars.  You cannot get more

6      than a 119.  In other words, we didn't just have extra

7      rail cars we could tag on at the end.  And again, I'd ask

8      the court to look at 4 G which deals with what the

9      railroads are obligated to provide, and under 4 G, the

10     railroads shall provide the necessary locomotives,

11     cabooses, and end of train devices, related transporation

12     facilities, equipment, and personnel needed for

13     railroads' provision of transportation under this

14     agreement.  Now, granted, I left out the word sole

15     discretion, and they are in there.  But again, as this

16     court's aware, the obligation in good faith and fair

17     dealing says that sole discretion does not mean unlimited

18     discretion.  It still has to be exercised in good faith.

19     And then I would bring the court back to the whereas

20     clauses.  First whereas clause acknowledges or references

21     entering into a supply contract for Powder River Basin

22     coal.  It references how the shipper will cause to be

23     loaded and the railroads will transport the coal

24     originating at the mines located in the Powder River

25     Basin.  Third whereas clause, the parties desire to

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                    37

```
 1    provide for transportation, equipment, service, and
 2    volume commitments, as well as a few-- as other things,
 3    and then fourth, they desire that the contractual
 4    arrangement promote maximum equipment utilization and
 5    efficiency.  Now, I respect the court's opinion.  I agree
 6    with the court's opinion, that those are not operative
 7    provisions.  But those cannot be completely ignored in
 8    construing this contract.  And if you construe all these
 9    provisions as I've laid out, there can be but one
10    conclusion, that these parties were gonna enter into a
11    long term contract, a 20 year contract, for the
12    transportation of all the coal Western needed to burn at
13    Jeffrey Energy Center, and that the railroads were gonna
14    provide the necessary equipment to move that coal, and
15    Western was gonna provide sufficient rail cars to move
16    that coal.  But if you accept the railroads' argument
17    that there's no timeliness standard, then again, it
18    results in an absurdity.  They could delay or park
19    trains, which they did at '97 and '98, to the detriment
20    of Western, impacting adversely the operations of the
21    Jeffrey Energy Center.  Now, I've covered a lot, and I
22    didn't do it in the exact order that you asked for, and I
23    hope it was still helpful.  But I've talked-- I have
24    talked about the relevant contract language you must
25    consider.  Is it ambiguous?  No, I don't-- we're not
```

Exhibit 1

00-CV-2043-CM                                        38

1      contending it is ambiguous.  These parties knew what they

2      were entering into in the sense of a long-term contract,

3      subject to fluctuations and variations.  But the issue

4      was not unlimited fluctuations or variations.  There is

5      still a standard imposed by good faith and fair dealing.

6      There's also a-- and there's also the legal standard in

7      construing a contract that no specific time provision is

8      set forth, that a reasonable time would apply.  And

9      finally, what is the proper construction of the disputed

10     contract terms?  Again, I would ask the court, as you all

11     ready have indicated, to construe the entire contract,

12     all provisions of the contract, in harmony to effectuate

13     the purpose and the intent of the parties, as opposed to

14     some absurd result.  And if you do that, it's our

15     position that you'll find, then, it is a contract for the

16     transportation of coal, not just coal, but all coal, that

17     Jeffrey needs to operate the Jeffrey-- excuse me-- that

18     Western needs to operate the Jeffrey Energy Center from

19     which there's only one source, the Powder River Basin,

20     and for which there's only one source of transportation,

21     these defendants.  One final point.  You ask an issue

22     about no limit on rail cars it must supply.  There--

23     granted is, there was gonna be fluctuation in the amount

24     of coal that was gonna be transported.  The more coal you

25     transport, the more trains, assuming the cycle time

Exhibit 1

00-CV-2043-CM                                    39

```
 1    remains the same, the more coal you're gonna transport,

 2    the more trains it's gonna take, you know, to move that

 3    coal.  And that's why the issue of sufficiency, didn't

 4    say an exact number, talked about sufficient cars.  But

 5    to say that there's no limit, again, is ludicrous.  And

 6    in fact, probably the best evidence of that is that at

 7    the time when we needed the coal the most and needed to

 8    put additional train sets in service to move that coal,

 9    '97 and '98, was the very time when the railroads were

10    saying, you can't add train sets, because we can't handle

11    'em.  We don't have the necessary equipment.  It will

12    only further the congestion.  So, is there a limit on the

13    rail cars?  Sure.  It's the amount that's reasonable in

14    order to meet the other obligations set forth in this

15    agreement, and that is, again, to transport this coal

16    under a reasonable cycle time where both parties exercise

17    good faith, in terms of nominating the coal and in

18    providing the equipment they need in order to move that

19    coal.  That's-- unless you have further questions, I'll

20    sit down.

21         THE COURT:  Thank you.

22         MR. BODAMER:  Thank you.

23         MR. SIPE:  Your Honor, if I may, briefly, I think

24    Mr. Bodamer-- and this is not an ad homonym reference-- I

25    think he took some liberties with your order, and I would
```

Exhibit 1

00-CV-2043-CM                                        40

1      just like to address two of the points he made, if I may,

2      very briefly.

3            THE COURT:  Yes.

4            MR. SIPE:  First of all, I think the essence of

5      their argument that we've heard here is that you can't

6      read the contract literally according to what it says,

7      according to what they agree is the unambiguous language,

8      because that would be ludicrous, ridiculous, repeatedly

9      said.  So, he's saying you can't believe that we would

10     have entered into a contract that the railroads could

11     take to ridiculous extremes by not moving any coal.

12     First point, Your Honor, is, we don't decide summary

13     judgment motions based on hypotheticals.  We decide them

14     based on the facts in the record and presented to the

15     court.  And nobody is contending here that the railroads

16     took weeks or months to move the trains.  Yes, it took a

17     long time to move the trains in 1997 and '98, longer than

18     the railroads wanted it to, and that was the worst rail

19     service crisis in recent memory, as they remind us, but

20     they got 92 percent of their coal then.  So, we're not

21     talking about the ludicrous interpretation that might

22     arise if the railroads never moved the trains, because we

23     did move the trains.  More slowly than we wanted to, but

24     we moved them.  And that's precisely the risk Western

25     accepted under this agreement.  The railroads have every

Exhibit 1

00-CV-2043-CM                                             41

```
 1     incentive to move the trains, because we only get paid
 2     for the coal we deliver.  When the trains run slowly, we
 3     make less money, and that's what happened in '97 and '98.
 4     That was not good for us.  We have no incentive
 5     whatsoever to ever perform in the way Mr. Bodamer
 6     describes in the hypothetical.  The second point I wanted
 7     to make, Your Honor, has to do with a very specific
 8     factual issue about accepting train sets into service in
 9     1997 and 1998, which Mr. Bodamer alluded to.  There is a
10     factual issue in the case as to whether on two instances,
11     one in late 1997, one in mid-1998, the railroads accepted
12     an additional train set, sufficiently, promptly, to
13     comply with their obligations under the contract.  There
14     are references to that in the record.  The key point on
15     this, Your Honor, however, is Western has claimed no
16     damages flowing from this alleged brief delay in
17     accepting those two train sets into service.  And for
18     purposes of sustaining a claim, they've not only got to
19     allege a breach, they've got to allege harm flowing from
20     that breach, and damages incurred as a result of those
21     two train sets, perhaps, being delayed somewhat in
22     putting-- in being put into service.  Given their failure
23     to allege damages, we believe it would be appropriate for
24     the court to grant summary judgment, notwithstanding
25     those facts.  Thank you, Your Honor.
```

Exhibit 1

00-CV-2043-CM                                        42

1          THE COURT:  Have a question for you.

2          MR. SIPE:  Yes, sir.

3          THE COURT:  Plaintiff in his argument relies on the

4     whereas provisions of the contract, and is arguing that

5     those provisions should also be taken into account when

6     the court makes a ruling in regards to these issues.  Do

7     you have a position in regards to that?

8          MR. SIPE:  Well, of course, I heard your prior

9     ruling, Your Honor, and if I understand the ruling

10    correctly, what you said is, the whereas clause does not

11    establish an independent obligation.  It is the operative

12    terms that establishes the obligations.  If there were

13    some specific language in the contract which were somehow

14    amplified by the whereas clause, under your ruling that

15    you've got to read all the language, then perhaps the

16    whereas clause might, under your ruling, have some

17    significance.  But I don't think they've pointed you to

18    any contract language that is amplified by the whereas

19    clause, and I think it might be helpful in this context

20    to think about Judge Lungstrom's decision in the Thompson

21    case, and Professor Farnsworth's distinction between

22    operative terms that are unambiguous and whereas clauses.

23    And what Judge Lungstrom found and what Professor

24    Farnsworth said is, that where the operative provision is

25    unambiguous, and you heard Mr. Bodamer concede that the

Exhibit 1

00-CV-2043-CM                                                    43

1    terms of the contract are unambiguous, the whereas clause

2    basically has little or no weight.

3         THE COURT:  Thank you.  Anything else, Mr. Bodamer?

4         MR. BODAMER:  Your Honor, if I might, just briefly.

5    What you just heard Mr. Sipe acknowledge by making the

6    argument, that for me to stand up here and say that your

7    construction of the contract the way they propose to do

8    it is ludicrous, you know, he responds by saying, we

9    never took weeks or months.  I mean, at the time we

10   entered into this contract, it was taking about 4 days to

11   cycle.  And the question is, should it have taken 4 or 14

12   or 40 or 400.  And they would say, well, we never took

13   400, we never even took 40.  But the question is, is the

14   amount they took, was it reasonable under the terms of

15   this contract.  And the Thompson case, on the application

16   of whereas clauses, Thompson doesn't deal with a

17   situation that we have here, which is where you have

18   whereas, an operative clause, both of which are clear and

19   both of which are consistent.  Clear in the sense that

20   here they're talking about the desire for maximum

21   utilization of equipment and efficiency, and that

22   amplifies the obligation of the parties with respect to

23   provision of rail cars on behalf of Western and the

24   provision of track, crews, locomotives, on behalf of the

25   railroads.  Thank you.

Exhibit 1

00-CV-2043-CM                                               44

1          THE COURT:  Anything else in regards to this issue?

2     If not, counsel, what the court intends to do is take a

3     brief recess, and I would tell you, hopefully no longer

4     than ten to fifteen minutes.  Be recessed until that

5     time.  Thank you.

6               (Court took a recess.  Proceedings continued

7     as follows:)

8          THE COURT:  I guess to start with, I would just say

9     that some people believe that time is a relative concept,

10    and my timing with you was that I was gonna be out for

11    about fifteen minutes.  As counsel knows, it was longer

12    than fifteen minutes.  And I apologize for the delay

13    while you were awaiting this court's ruling.  Part of

14    that is part of the reason why you're here this morning

15    and now this afternoon, which is that the court was

16    familiar with your arguments that you set out in your

17    pleadings as it relates to the issues that I've taken up,

18    but I don't know if counsel would agree with me or not,

19    but because of the complexity of the issues that were

20    raised and regarding your-- your arguments in support of

21    the positions you were taking, the court wanted to be

22    clear in regards to your arguments as well as the

23    authorities that you were relying on.  So, that's why the

24    court requested that you come here this morning.  Along

25    the same lines, this issue that the court's taken up at

Exhibit 1

00-CV-2043-CM                                          45

1       this time, which has to do with the motion for summary

2       judgment, and specifically the arguments regarding the

3       construction of specific contract terms, I wanted to take

4       time to go over your arguments that you made this

5       morning, in light of what's all ready been plead, and to

6       carefully review them one last time before I made my

7       ruling, just to make sure, again, that I was clear in

8       regards to what you were actually arguing, as well as to

9       review the law, and also specifically, in this issue, the

10      specific contract provisions that you were relying on.

11      So, it took me a little bit longer than I thought.

12      Again, I apologize for that delay, but the whole purpose

13      of that was to try to ascertain, again, the accuracy of

14      your arguments as well as the authorities you were

15      relying on.  At this time, I am going to make some

16      rulings in regards to defendant's motion for summary

17      judgment dismissing all counts in plaintiff's first

18      amended complaint.  And, I would set out for the record,

19      that the court has reviewed the contract provisions set

20      out by the parties in their arguments, and considered

21      their assertions that these terms are unambiguous.

22      Accordingly, the court rules as follows on the disputed

23      contract terms.  Those were the ones that the court set

24      out for you to argue.  Specifically, number one, and

25      there's an argument, and defendants were asking the court

Exhibit 1

00-CV-2043-CM                                           46

1    to find as a matter of law that no cycle time or other

2    timeliness standard was contemplated in the contract.

3    The court finds the parties did not intend to include,

4    and in fact, did not include in the contract a specific

5    cycle time provision dictating a specific time standard

6    that governs the parties' obligations under the contract.

7    However, after reviewing the contract as a whole, as it

8    must, the court finds that the parties did contemplate a

9    reasonable timeliness standard which would govern their

10   contractual obligations.  Whereas here, a timeliness

11   standard has not been specified in a contract, a

12   reasonable time for performance must be construed by the

13   trier of fact.  That's from a case of Rymph, spelled

14   R-Y-M-P-H versus Derby Oil Company at 211 Kansas 414.

15   Defense also asks court to find as a matter of law that

16   the contract does not require the defendants to transport

17   all of plaintiff's coal requirements to JEC.  Regards to

18   that issue, the court finds the parties did not

19   contemplate that the defendants would transport all of

20   plaintiff's coal requirements to JEC.  Instead, the clear

21   provisions of the contract require that defendants,

22   quote, shall transport all coal loaded in rail cars and

23   tendered by shipper at origins, end quote, and that's

24   from Article 3 A.  Further, the court finds the parties

25   contemplated an annual minimum volume, rather than

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                          47

1       contemplating that all of plaintiff's requirements would

2       be shipped, by noting in Article 5 A 1, that, quote,

3       during each calendar year of the agreement, the railroads

4       shall transport the greater of 6 million tons or 100

5       percent of all tons of coal shipped from origins for

6       delivery to JEC, end quote.  Defendants also ask the

7       court to find that the contract does not limit the number

8       of trains or rail cars that plaintiff may need to supply.

9       Court finds the parties did not intend that the number of

10      trains or rail cars that plaintiff may need to supply

11      would be limited.  The contract, instead, contemplates a

12      minimum number of rail cars that plaintiff must provide.

13      The contract further contemplates that additional rail

14      cars may need to be provided by plaintiff.  However, the

15      court finds there is no limit on the number of rail cars

16      to be supplied by plaintiff in the contract.  Included in

17      defendant's motion for summary judgment were issues

18      involving restitution.  Given the court's ruling today,

19      the court finds that those remaining issues and arguments

20      as they were directed towards plaintiff's claim for

21      restitution, slash, termination, slash, recision are

22      moot.  Defendants in their motion for summary judgment

23      also argue and contend that they should be granted

24      judgment on a breach of obligation of good faith claim,

25      because Kansas law does not provide a separate cause of

Exhibit 1

00-CV-2043-CM                                          48

1      action based on the duty of good faith and fair dealing

2      in performance of a contract.  Defendants appear to argue

3      that where plaintiff's breach of contract claim fails,

4      plaintiff's implied covenant claim based on this same

5      contract must also fail.  As indicated previously, the

6      court has denied defendants' motion seeking judgment as a

7      matter of law on plaintiff's breach of contract claim.

8      Accordingly, as defendants' arguments are co-dependent,

9      the court similarly denies defendants' motion seeking

10     summary judgment on plaintiff's implied covenant claim.

11     Under Kansas law, a duty of good faith and fair dealing

12     is implied in every contract, except employment at will

13     contracts.  That's from Daniels versus Army National Bank

14     at 249 Kansas 654.  The implied covenant is declarative

15     in nature.  It, quote, does not create or supply new

16     contract terms, but grows out of existing ones, end

17     quote.  That's from Pizza Management Incorporated versus

18     Pizza Hut at 737 Fed. Supp. 1154.  Because the duty is

19     implied in a contract, quote, conduct of the party from

20     that duty is a breach of a contractual obligation, end

21     quote.  That's from Bonanza Incorporated versus McLean at

22     242 Kansas 209.  Accordingly, a breach of duty of good

23     faith and fair dealing is considered a breach of

24     contract.  Again, that's from Pizza Management

25     Incorporated, 737 Fed. Supp. at 1167.  Here, plaintiffs

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                        49

1    assert a claim of breach of duty of good faith and fair

2    dealing.  Under Kansas law, this claim is more properly

3    characterized as a breach of contract claim based upon

4    alleged breach of contract term allegedly established by

5    the implied covenant.  Although plaintiff has

6    characterized its implied covenant claim as a breach of

7    the duty of good faith, the court construes that claim as

8    a claim for breach of contract.  Count two, plaintiff

9    alleges defendants' breached the duty of good faith and

10   fair dealing by engaging in behavior that constitutes a

11   breach of the contract at issue.  Although the implied

12   covenant may not be used to create, quote, essential

13   terms of the contract on which minds of the parties have

14   not met, end quote, the courts will impose such implied

15   duty where the good faith performance of an obligation or

16   a duty is required in order to effect the reasonable

17   expectations of the parties.  That's from a case of

18   Flight Concepts at 38 Fed. 3rd 1157.  Defendants' motion

19   is granted in part and denied in part, as stated on the

20   record.  Specifically, defendants' motion is granted to

21   the extent it asks the court to find as a matter of law

22   that the contract at issue is fully integrated.

23   Defendants' motion is granted to the extent it asks the

24   court to find that no independent obligation is created

25   by the fourth whereas clause at issue.  And regarding the

Exhibit 1

00-CV-2043-CM                                          50

```
1      contract construction issues, number one, defendants'
2      motion is denied to the extent it asks the court to find
3      as a matter of law that no timeliness standard or cycle
4      time standard is contemplated in the contract.  Number
5      two, defendants' motion is granted to the extent it asks
6      the court to find as a matter of law that the contract
7      does not require defendants to transport all of
8      plaintiff's coal requirements to JEC.  Number three,
9      defendants' motion is granted to the extent it asks the
10     court to find as a matter of law that the contract does
11     not limit the number of trains or rail cars that
12     plaintiff may need to supply.  Defendants' motion is
13     considered moot as to all remaining issues, ie, the
14     arguments directed towards termination, recision,
15     restitution claims.  The court made its ruling in regards
16     to the breach of good faith obligation, and that finally,
17     the defendants' motion is denied, as the court finds that
18     genuine issues of material fact exist that preclude
19     summary judgment on plaintiff's remaining breach of
20     contract claim.  Last motion is plaintiff Western
21     Resources' motion for partial summary judgment, which is
22     document 344.  Plaintiff is asking the court to find the
23     contracts between the parties are valid and enforceable
24     requirements contracts within the meaning of Kansas law.
25     Such declaration will, plaintiff contends, define the
```

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                        51

1    parties' obligations.  Specifically, plaintiffs contend

2    that where the contracts at issue are declared

3    requirement contracts, the parties are required to act in

4    accordance with standards of quote, good faith, end

5    quote, and reasonableness, end quote, in administering,

6    interpreting, and enforcing the contracts.  Plaintiff

7    contends that the requirements contracts impose an

8    obligation upon plaintiff to buy all the transportation

9    of coal it required to fuel its JEC plant from

10   defendants, and impose an obligation upon defendants to

11   stand ready and able to provide all those transportation

12   needs.  Again, I'm familiar with the arguments in the

13   pleadings.  The court does have some questions in regards

14   to this argument, or this issue.  Specifically, from the

15   plaintiffs, and defendants, what do the parties believe

16   the effect of declaring the contracts at issue are

17   requirements contracts will be, if they differ from what

18   the court's all ready set out?  And number two, what

19   additional obligations imposed upon the parties under

20   this label of requirements contract are-- that are not

21   present under general contract law principles?  And

22   again, I guess, the court wants clarification in regards

23   to what is-- what legal effect does this label have over

24   and above general contract law principles?  It appears to

25   the court that the parties are not disagreeing that a

Exhibit 1

00-CV-2043-CM                                              52

```
 1    contract was entered into.  It's more, the disagreement
 2    has to do with its terms.  Is it still Mr. Bodamer in
 3    regards to that?
 4        MR. BODAMER:  Yes.  Yes, sir.  I think the-- trying
 5    to-- in line of what you've been talking about and
 6    ruling, I'm trying to think how best to structure this,
 7    but in the absence-- let's put it this way, if this court
 8    determines that there is no obligation to deliver
 9    Western's requirements for Jeffrey Energy Center, then
10    what are the railroads' transportation obligations?
11    Because, as we talked about earlier, it is a contract for
12    the transportation of coal with no specified amount of
13    coal set forth in the contract.  And in the KPL versus BN
14    case, the 10th Circuit decided in 1985, '84, '85, the
15    railroads' challenged-- at that time to that particular
16    contract, which was very similar to this one in that
17    respect-- that there was no specified amount of coal to
18    be delivered at any given time; it was undefined,
19    unlimited, and the railroads' challenged that agreement,
20    because it was in their mind illusory, that there was no
21    obligation by either party really to perform, and the
22    court said no, there an obligation, because it was clear
23    from the agreement and the circumstances that Western
24    desi-- or that the KPL desired and needed all of its coal
25    from the Powder River Basin for use at JEC transported by
```

Exhibit 1

00-CV-2043-CM                                    53

1       the BN, in that Western had an obligation-- or excuse

2       me-- KPL, our predecessor, had an obligation to exercise

3       good faith in determining what its needs were, and then

4       likewise, the railroads had an obligation, then, to

5       deliver those requirements as specified, in good faith,

6       and so, the requirements aspect of it, because we weren't

7       taking the specified amount, but we were basically taking

8       all output, they would transport all coal.  Then the

9       court said the contract's not illusory.  It's not missing

10      a key term, and that it is enforceable.  And whereas the

11      BN was trying to avoid the contract at that time, because

12      they wanted to get a higher price to a different tariff.

13      Court said, no, BN, you're bound-- you are bound to

14      deliver the requirements, and Western, you're bound to

15      transport your requirements via the BN.  The same issue

16      came up a few years later, 1995, I think, and we cited

17      this in our papers as well, in the district court of

18      Shawnee County case, except the roles were reversed.  It

19      actually involved a different Western plant.  It involved

20      the Lawrence and Tecumseh plant, also referred to as

21      LEC-TEC (sp.), and at that time KPL, or Western actually,

22      was taking the position that they did not have to

23      transport all their requirements, the Lawrence and

24      Tecumseh, via the railroads, and the railroads said, oh,

25      yes, you do, because it's clear in that contract, as it

Case 2:06-cv-00515-RTR   Filed 04/04/08   Page 53 of 65   Document 68

Exhibit 1

00-CV-2043-CM                                    54

1      is in this one, by the way, that there was an obligation

2      to transport 100 percent or all-- actually they used all,

3      we use 100 percent of all, of the requirements.  And so,

4      once again, that's two courts have looked at contracts in

5      the same context involving similar moves, one identical

6      move, the other a similar move, and said, these contracts

7      are enforceable as requirements contracts.  Now, what

8      impact does it have on our case?  Well, I suppose in

9      light of the court's ruling, there's still an issue to be

10     tried to the jury as to whether the railroads timely

11     transported our coal, and whether they timely returned

12     the empties.  And maybe ultimately it makes no

13     difference, but the way we have always viewed the case,

14     and as set forth in our pretrial order, and I think in

15     our complaints and amended complaints, we were committed

16     to the railroads to transport all of our coal needs that

17     we need to operate Jeffrey Energy Center everyday to

18     supply our 6 hundred thousand, Western's 6 hundred

19     thousand customers, that we were obligated to transport

20     all that coal via these railroads, and then likewise, the

21     railroads were obligated to provide, again, necessary

22     equipment and facilities in order to transport that coal.

23     And we also have taken the position that although the

24     annual declarations as to what our coal needs,

25     anticipated coal needs would be, we're non-binding in the

Exhibit 1

00-CV-2043-CM                                                55

1    sense they could vary and could be changed, as they were

2    from time to time, that the amount of coal we needed is

3    best evidenced by the amount of coal we declared we would

4    need by month for the coming year.  And so, our-- our

5    theory of-- of the way we were-- or intend to prove our

6    damages is to show that it's our position that our needs

7    are evidenced by our declarations, and that there's no

8    dispute in this case, but that the railroads in '97 and

9    98, and again in 2001, failed to transport all the coal

10   we needed to run Jeffrey Energy Center; in other words,

11   all of our requirements.  Now, that's-- I mean, that's

12   the essence of the case.  Umm, now, they didn't do it,

13   and the reason we only moved for partial summary judgment

14   as opposed to, you know, summary judgment, saying, well,

15   clearly there's a breach here, because there is this

16   issue as to the timeliness that they needed to cycle

17   those trains, and there is the issue as to the

18   sufficiency of the cars that we're required to provide,

19   and that it's for ultimately the jury to decide whether

20   the parties complied with the specific terms of this

21   agreement, whether they did so in good faith, whether

22   they did exercise fair dealing, in terms of the way they

23   construed and-- and operated under this particular

24   agreement, and that the requirements aspect of it,

25   though, was ultimately the determinative of whether they

Exhibit 1

00-CV-2043-CM                                              56

 1     had met their obligation, and if so, what were our

 2     damages, our compensatory damages, for their failure to

 3     do so?  Also, with respect to the restitution claim,

 4     which-- and I want to ask for clarification for that-- on

 5     that in a minute, but if it also provided a basis there,

 6     because, you know, they've told you, I think, today, and

 7     it's clearly in the papers, you know, that they

 8     transported 91 or 92 percent, you know, during this

 9     questionable period, and 98 percent over a long period of

10     time, but it's clear that what Western needed was a-- you

11     know-- regular, consistent, and reliable supply of coal,

12     and that it did little good to receive coal tomorrow that

13     we needed to burn today in order to keep these lights and

14     these air conditioners running.  And so, the requirements

15     aspects, again, based on our nominations, would provide a

16     basis for whether-- not only for whether there was a

17     breach, but whether that breach was substantial, and

18     again, it's our position that-- that it would be.  I

19     think-- have I answered your-- I believe that's all I

20     have-- I think I've answered your question.

21          THE COURT:  Thank you.  Mr. Sipe.

22          MR. SIPE:  Your Honor, might I ask you to restate

23     the first of the two questions, just so I'm sure that I

24     have it straight?

25          THE COURT:  In regards to the partial summary


NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                        57

1    judgment motion, the court is asking that, what do the

2    parties believe the effect of declaring the contracts at

3    issue are requirements contracts will be, the legal

4    effect of that, and what additional obligation imposed

5    upon the parties under this label are not present under

6    general contract law principles?

7        MR. SIPE:  I'm going to answer these questions,

8    Your Honor, in light of your prior rulings on the

9    railroads' motion, as I understand those rulings.  And

10   the answer to the first question is that the-- the legal

11   effect of declaring this contract a requirements

12   contract, in light of your prior ruling, would be, I

13   think it would be, first of all, meaningless, because to

14   say it's a requirements contract really doesn't say

15   anything about the specific obligations under the

16   contract.  But it also, I think, would be inconsistent

17   with the prior ruling, which, if I understand it

18   correctly, held that the railroads do not have an

19   obligation to transport Western's requirements to the

20   Jeffrey Energy Center; that they have an obligation only

21   to transport a minimum of 6 million tons a year, and that

22   their actual transportation obligation is spelled out in

23   Article 3 A, which is to transport all the coal loaded

24   and tendered at the mines.  Therefore, in response to the

25   first question, I think the-- not only would there be no

Exhibit 1

00-CV-2043-CM                                      58

1    point in granting the motion and declaring this a

2    requirements contract, but it would result in an

3    inconsistency with the prior ruling.  As to the second

4    question, what additional legal effect or con-- or

5    contract obligations might be imposed beyond those

6    expressed either in this agreement or in contract law if

7    the label were adopted?  I think the answer, again, is

8    none, and it would be counter-productive to impose the

9    label.  The court has all ready ruled that this is a

10   fully integrated contract, and is to be interpreted in

11   accordance with the literal language of the operative

12   provisions.  And adding the requirements label on top of

13   that would do nothing.  Mr. Bodamer's reference to prior

14   cases involving contract law, requirements contracts, is

15   clearly in opposite, given the ruling that this is a

16   fully integrated contract.  I believe I've been

17   responsive, Your Honor, to your questions, but if you

18   have further ones, I'd be happy to try to answer them.

19        THE COURT:  Thank you.  Anything else, Mr. Bodamer?

20        MR. BODAMER:  Just one brief point, Judge.  Mr.

21   Sipe again said that the obligation is to ship 6 million

22   tons, but it's not.  The obligation is to ship the

23   greater of 6 million tons or 100 percent of all coal

24   shipped from the Powder River Basin to Jeffrey Energy

25   Center.  And under the theory that you just heard, we

Exhibit 1

00-CV-2043-CM                                    59

1       have-- and based on the court's findings earlier today,

2       this would result in Western being obligated to ship all

3       of its coal needs via these railroads, but the railroads

4       are only obligated to ship 6 million tons.  I mean,

5       that's no way to run a railroad.  And to say that, I

6       mean, then again, it leaves it totally within the

7       railroads' determination as to how much they'll ship,

8       because even with a finding that there's an unlimited

9       amount of rail cars or train sets we're obligated to put

10      in service, the more we put in, the more they

11      theoretically would be able to park, and so, we never

12      get-- I mean, it's just-- it would be an endless

13      situation, and therefore, I think an illusory contract.

14      Maybe there's no contract at all under the theory that

15      the railroads deposited here.  Thank you.

16          THE COURT:  If there's nothing else, give me a

17      minute here.  Court's ready to rule in regards to this

18      motion.  Court would set out what it believes to be the

19      relevant law that relates to this issue.  Requirements

20      contracts have long been held valid and enforceable in

21      Kansas.  In reference to this case, Kansas Power and

22      Light Company versus Burlington Northern Railway Company

23      at 740 Fed. 2nd, 780, that's a 10th Circuit case from

24      1984, also Miller versus Sirloin Stockade, 224 Kansas 32,

25      1978 case.  In a typical requirements contract, a buyer

Exhibit 1

00-CV-2043-CM                                    60

1       agrees to buy all of the items it requires, in good faith

2       from the seller.  A requirements contract, also referred

3       to as an exclusive dealing contract, obligates both

4       parties-- I'll highlight this for you counsel-- to use

5       best efforts in their performance of the contract.  That

6       is, they must operate in good faith and be reasonably

7       diligent in performing under the contract.  That's from

8       Kansas Statute Annotated, section 84-2-306, comment

9       number three.  And generally for requirements contracts

10      to be valid, case law requires that the buyer promise to

11      buy the goods at issue, exclusively from the seller.  If

12      such exclusivity is absent, generally the contract lacks

13      mutuality, since the buyer might order all its

14      requirements from other suppliers.  That's from Kansas

15      Statute Annotated 84-2-306, comment two.  And also,

16      Propane Industries Incorporated versus General Motors

17      Corporation, at 429, Fed. Supp., at 214, it's a Western

18      district of Missouri case where they applied Kansas law,

19      based on the facts in their case.  However, the

20      agreement, or quote, the agreement need not specifically

21      require the buyer to forego other supply sources if the

22      practical effect is the same, end quote.  And that's from

23      Perington Wholesale Incorporated versus Burger King

24      Corporation, at 631 Fed. 2nd 1369, 10th Circuit case,

25      1979.  The court's understanding of what the relevant law

Exhibit 1

00-CV-2043-CM                                          61

1     is as I've set it out, the court is gonna make a ruling

2     that it believes is not inconsistent with the previous

3     ruling that defendants pointed out in their arguments.

4     Specifically, defendants state that previously regarding

5     the contract construction issue, the court had ruled that

6     defendants' motion was granted to the extent it asks the

7     court to find as a matter of law that the contract does

8     not require defendants to transport all of plaintiff's

9     coal requirements to JEC.  The court does not find that

10    inconsistent with the fact that here, the court finds the

11    parties have entered into a requirements contract,

12    thereby obligating the parties to act in good faith and

13    in a reasonably diligent manner when performing the terms

14    of the contract.  Specifically, the requirements

15    contracts obligated the plaintiff to purchase its

16    transportation requirements for JEC from defendants, and

17    obligated defendants to be reasonably diligent and to use

18    their best efforts to provide those transportation needs.

19    I believe those were all the motions the court identified

20    at the beginning of our hearing as to what I was gonna

21    rule on.  In light of the court's rulings today, the

22    court would ask counsel that you review the motions

23    and/or issues that remain outstanding, and consider

24    whether any of those motions are rendered moot or no

25    longer at issue.  And I'm gonna ask that you inform the

Exhibit 1

00-CV-2043-CM                                    62

1     court about any changes, if there are any, by this

2     Friday, July 26th.  One last matter the court has,

3     counsel.  I reviewed the papers that have been submitted

4     in regards to our Daubert issues.  I am requesting

5     counsel's cooperation and their assistance in regards to

6     those Daubert matters.  The court is requesting that the

7     parties prepare a one to two page summary on each of

8     their proposed experts, including the very specific

9     areas.  Number one, what specific testimony is the expert

10    tendered to give?  Number two, what specific issue is the

11    proposed testimony relevant to?  Is it in regards to the

12    claims, is it in regards to specific contract provisions,

13    is it in regards to damage-- the damages?  Number three,

14    why is the expert qualified to give the specific

15    testimony?  And number four, why is the expert's proposed

16    testimony reliable?  Likewise, for each pending motion in

17    limine, the court is asking the moving party to prepare,

18    again, a summary of why the expert is not qualified to

19    testify as proposed, and number two, why is the expert's

20    proposed testimony not reliable?  As it relates to this

21    Daubert matter as well as this motion in limine, the

22    court is asking that that be submitted to the court by

23    this Friday, July 26th.  Part of that, counsel, is that

24    we're on a very short time-frame here.  As you know,

25    based on what I said at the very, very beginning, we have

Exhibit 1

00-CV-2043-CM                                            63

1       Daubert hearings scheduled for August 7th, 8th, and 9th,

2       and we have our motions in limine the following week, and

3       then we have our trial scheduled for August 19th.  My

4       hope, counsel, with all of this, calling you in today and

5       also getting these other additional matters addressed, is

6       to allow you to adequately prepare your case for trial,

7       and as a result, also allow the court to be prepared to

8       address any issues that come up, or give you, hopefully,

9       some direction in regards to the presentation of your

10      evidence, if and when we start our trial.  So, I would

11      ask for your cooperation.  I will let you know that-- I

12      usually save this for day of trial, but assisting me with

13      this case is my law clerk Jennifer Lepentis, and if there

14      are questions that come up, she is the person to speak

15      to.  One of the things I do with every case is inform

16      counsel at the beginning of our trial, is that whenever

17      my clerks speak to you, in this case Miss Lepentis, you

18      can take that as the court speaking to you.  So, whatever

19      questions she has of you, I would appreciate your

20      cooperation, and any courtesies you may give me, transfer

21      to my staff.  Along with her today, we had Jennifer

22      Newman assisting us, intern with the clerk's office.  My

23      courtroom deputy, my administrative assistant, is Jane

24      Casady right in front of me, and she is the person that

25      maybe you all ready have had contact/communication with.

NANCY MORONEY WISS, CSR, RMR

Exhibit 1

00-CV-2043-CM                                    64

1    Again, I'd ask that you cooperate with her as much as

2    you're able to.  Our court reporter, you probably all

3    ready met, is Nancy Wiss.  Counsel, there's a lot that I

4    covered.  Again, I'm finished with what I was intending

5    to do this afternoon.  Unless there's anything else,

6    we'll be recessed at this time.  I'll wait to hear from

7    you in the future.  Thank you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1

00-CV-2043-CM                                        65

1                C E R T I F I C A T E

2

3          I, Nancy Moroney Wiss, a Certified Shorthand

4     Reporter and the regularly appointed, qualified and

5     acting official reporter of the United States District

6     Court for the District of Kansas, do hereby certify that

7     as such official reporter, I was present at and reported

8     in machine shorthand the above and foregoing proceedings.

9          I further certify that the foregoing transcript,

10    consisting of 65 typewritten pages, is a full, true, and

11    correct reproduction of my shorthand notes as reflected

12    by this transcript.

13          SIGNED this 23rd day of July, 2002.

14

15                              _____

16                              Nancy Moroney Wiss, CSR, CM

17

18

19

20

21

22

23

24

25

NANCY MORONEY WISS, CSR, RMR