# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**WISCONSIN ELECTRIC POWER COMPANY,**

        Plaintiff,

  -vs-                                                  **Case No. 06-C-515**

**UNION PACIFIC RAILROAD COMPANY,**

        Defendant.

## DECISION AND ORDER

This matter relates to a coal transportation agreement between Wisconsin Electric Power Company ("WEPCO") and Union Pacific Railroad Company ("UP"). WEPCO alleges that UP refused to apply certain rates (known as "backhaul rates") to the transportation of coal in violation of the agreement between May 1, 2004 and December 31, 2005. WEPCO also alleges that UP failed to supply a sufficient number of railcars for the transportation of coal, which resulted in delivery shortfalls in 2003, 2004 and 2005. Finally, WEPCO alleges that UP breached its duty of good faith and fair dealing.

UP moves for summary judgment, seeking the dismissal of all of WEPCO's claims. WEPCO moves for partial summary judgment on the issue of whether UP had an obligation to use good faith reasonable efforts to provide the necessary equipment, including railcars,

to move the volumes of coal nominated by WEPCO under the agreement. For the reasons that follow, UP's motion is granted, and WEPCO's motion is denied.[1]

## BACKGROUND

WEPCO is a Wisconsin corporation that provides electricity to more than one million wholesale and retail customers in Wisconsin and Michigan. WEPCO's principal place of business is Milwaukee, Wisconsin. WEPCO is a subsidiary of Wisconsin Energy Corporation.

WEPCO owns and operates several coal-fired power plants. One such plant is the Valley Generating Station in Milwaukee. Another is the Presque Isle Generating Station located at Marquette, Michigan. The Valley Generating Station is located adjacent to Lake Michigan and receives coal only by water. The Presque Isle Station is located adjacent to Lake Superior and also receives coal only by water. Both stations use coal originating in Colorado as part of the fuel burned to generate electricity.

UP is a Delaware corporation with its principal place of business in Omaha, Nebraska. UP owns lines of rail and related facilities in various states, including Wisconsin. UP provides rail transportation service under contractual arrangements and as a common carrier. UP offers rail transportation service in Colorado. UP serves Colorado coal mines via two rail lines known as the North Fork and Craig Branches. UP serves a mine known as the Elk Creek Mine at Somerset, Colorado, located on the North Fork Branch.

---

[1] Also pending are a variety of motions to exclude expert witnesses. In light of the Court's disposition of the summary judgment motions, these motions are denied as moot. Additionally, UP filed a Rule 7.4 Expedited Non-Dispositive Motion to Strike Plaintiff's Reply Proposed Findings of Fact. This motion is also denied as moot.

The Colorado coal burned at the Valley and Presque Isle Stations is transported by UP via rail from mine origins in Colorado to the KCBX Terminal located in Chicago, Illinois. KCBX Terminal is then responsible for transloading WEPCO's coal from UP's trains into lake-going ships. WEPCO contracts with certain water carriers to deliver the coal transloaded at the KCBX Terminal to either the Valley of Presque Isle Stations.

WEPCO and UP entered a confidential rail transportation agreement designated as UP-C-35583 (the "Agreement" or the "Contract"). The Agreement became effective on January 1, 1999 and expired December 31, 2005. The Agreement governs rates and terms for shipments of coal between specified mine origins in Colorado and specified destinations. The Elk Creek Mine at Somerset, Colorado is a mine origin covered by the Contract (referred to in the Contract as Sanborn Creek). From 2003-2005, WEPCO purchased almost all of its Colorado coal from the Sanborn Creek and West Elk mines on UP's North Fork Branch. The KCBX Terminal is a destination covered by the Contract.

Article IX.B sets out, in a table, the applicable freight rates for shipments of coal from mine origins in Colorado to the KCBX Terminal in Chicago:

| Origins | For Trains Comprised of Railroad Railcars with Back Haul Movement | For Trains Comprised of Railroad Railcars Without Backhaul | For Trains Comprised of Steel Shipper Railcars | For Trains Comprised of Aluminum Shipper Railcars |
|---|---|---|---|---|
| Colowyo and Twentymile Mines | N/A | $15.63 | $13.43 | $13.18 |
| Powderhorn Mine | $13.20 | $15.63 | $13.43 | $13.18 |

| Bowie, Sanborn Creek and West Elk Mine | $13.20 | $16.50 | $14.35 | $14.10 |

Article IX.B further provides that for the calendar years 2003-2005, WEPCO may transport up to 1.125 million tons of coal in railroad supplied cars at the backhaul rate ("For Trains Comprised of Railroad Railcars with Back Haul Movement"). During the 2003-2005 period, WEPCO shipped all but 12 trainloads of coal using UP railcars and either the freight rates "For Trains Comprised of Railroad Railcars with Back Haul Movement" or the freight rates "For Trains Comprised of Railroad Railcars Without Backhaul."

The term "Back Haul Movement" is defined in Article I.A of the Agreement as "movement of Coal from Origin(s) to KCBX in Railroad Railcars which when made empty of Coal are repositioned to reload with iron ore pellets destined to Geneva, Utah." In November 2001, the destination plant in Geneva, Utah (Geneva Steel) announced a temporary shutdown of its plant and stopped shipping iron ore. Despite efforts to restart its business, Geneva eventually shut down its operations permanently and, in February 2004, sold its core steel-making machinery to an entity in China. On April 22, 2004, UP's Jim Halper sent a letter to WEPCO's Klaus Mylotta which stated:

> The movement of iron ore pellets destined to Geneva, Utah has ceased and Union Pacific no longer has other agreements to transport iron ore to Geneva, Utah. UP is thus declaring an event of Force Majeure pursuant to Article XI.C of the Agreement, effective May 1, 2004, which will apply to Back Haul Movements to KCBX. Therefore, the Back Haul Movement rates in the Agreement will no longer apply.

-4-

Prior to sending this "force majeure letter" on April 22, 2004, UP had never previously indicated that it believed it had the right to cancel a Contract rate using the force majeure clause.

Mr. Halper's letter further stated that shipments of iron ore to Geneva, Utah were unlikely to resume before the Agreement terminated on December 31, 2005. Beginning May 1, 2004, UP charged WEPCO the non-backhaul rates for all coal that WEPCO chose to ship from Colorado North Fork mines to KCBX in railroad-owned equipment. UP charged WEPCO the backhaul rates for qualifying shipments of coal from January 1, 2000 through April 30, 2004.

**ANALYSIS**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**Count One: Discontinuation of backhaul rates**

Article XI.A of the Agreement authorizes the suspension of obligations under the Contract where a party affected by "Force Majeure" events "is delayed in or prevented from

the performance of those obligations." Article XI.C provides that the backhaul rate "is predicated on the interrelated action of Railroad's repositioning the empty Coal Trains by reloading with iron ore destined to Geneva, Utah." Article XI.C further provides that "an event of Force Majeure impacting iron ore reloading to Geneva, Utah shall constitute an event of Force Majeure under this Agreement."

On April 22, 2004, UP gave notice of a force majeure event which terminated the movement of iron ore pellets to Geneva, Utah. Therefore, UP discontinued the backhaul rate, effective May 1, 2004. WEPCO argues that this notice was ineffective because the iron ore shipments had ceased more than two years earlier. Accordingly, WEPCO argues that UP waived its right to declare a force majeure event because it continued to charge the back haul rate for approximately two and one half years after the actual discontinuation of iron ore shipments.

However, the Agreement contains an express non-waiver provision (Article XXIII),[2] as well as a provision dictating that the Agreement could only be modified in writing (Article XXII).[3] WEPCO argues that the non-waiver provision should be ignored in light of UP's "exceptional delay" in exercising its force majeure termination rights, and also because

---

[2] Article XXIII provides: "The failure of any party to this Agreement, in any one or more than one instance, to insist upon the performance of any of the terms or conditions of this Agreement, *or to exercise any rights or privileges under this Agreement*, or the waiver by any party to this Agreement of any breach of the terms or conditions of this Agreement, *shall not be construed thereafter as waiving any such terms, covenants, rights, privileges or obligations*, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred (emphasis added)."

[3] Article XXII provides: "No subsequent agreement amending, supplementing, modifying, or terminating this Agreement shall be binding on Railroad or Shipper unless in writing and executed by their respective authorized representatives."

-6-

WEPCO relied on the continuation of the backhaul rates to its detriment. *See Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis*, 723 F.2d 512, 518 (7th Cir. 1983) (under Indiana law, party waived its contractual right, in part, because of exceptional delay in exercising that right).

Despite the delay in exercising its force majeure rights, the Court finds that UP did not waive those rights. WEPCO provides no evidence suggesting that UP actually waived the "waiver only in writing" provisions of the contract. *See Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202-03 (7th Cir. 1986) (under Illinois law, "waiver only in writing" provision can be waived only by words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence). While the Agreement contains a Wisconsin choice of law provision (Article XVI), there is no reason to believe that Wisconsin law is any different on this point.

Furthermore, WEPCO's detrimental reliance argument is unconvincing. When UP invoked force majeure under the Agreement, UP did not attempt to retroactively enforce the non-backhaul rates to the original occurrence of the event. Therefore, WEPCO obtained the benefit of over $7 million dollars in savings up until the point that UP actually enforced its force majeure rights. WEPCO argues that it reasonably relied on the continuation of the lower rates, but such reliance simply was not reasonable. The contract is clearly written in such a way that UP retained the right to invoke force majeure at any time based on the cessation of the iron ore movement to Geneva, Utah.[4] WEPCO could not rely on UP's initial

---

[4] The Court notes that WEPCO failed to create a genuine issue of fact as to whether WEPCO knew that the backhaul movement had stopped in 2001.

-7-

failure to invoke force majeure, particularly in light of the waiver only in writing provisions in the Agreement. *See Gonzalez v. Teskey*, 160 Wis. 2d 1, 14, 465 N.W.2d 525 (Ct. App. 1990) (in order to apply equitable estoppel, party's reliance on the conduct of another must be reasonable).

WEPCO argues that UP's notice was untimely under Article XI.D, which provides that "In order for Force Majeure to be effective, the party affected by a Force Majeure shall notify promptly by telephone or wire all other parties as to the nature of the Force Majeure, when it began, and its projected duration." WEPCO takes this to mean that the notice must be given "promptly" in relation to the initial occurrence of the Force Majeure event, i.e., the initial stoppage of the iron ore movement to Geneva, Utah. Again, this position is trumped by the express non-waiver provision in the Agreement, which was never waived by UP. Further, UP's notice was timely under the plain language of Article XI.D because it gave advance notice of the cessation of the backhaul rate and did not attempt to back-charge WEPCO for coal previously shipped.

WEPCO also argues that there is a genuine issue of material fact under Article XI.E, which provides that the parties "shall make all reasonable efforts to eliminate or abate such Force Majeure and resume their obligations expeditiously upon its cessation..." This general duty to abate gives way to the specific nature of the rights and obligations surrounding the westbound iron ore movement. As a matter of law, UP had no control over the westbound iron ore movement, which ceased because of the Geneva Steel bankruptcy, and UP had an absolute right to declare force majeure in that instance. The general duty to abate applies to

-8-

the more general instances of force majeure as contemplated by the contract: *e.g.*, accumulation of snow, explosion, fire or derailment. Article XI.A.

Finally, the Court notes that WEPCO provides extrinsic evidence, such as the parties' course of performance, in support of its claim for breach of contract. As should be clear, the language of the Agreement is straightforward and unambiguous: cessation of the westbound iron ore movement gave UP unequivocal force majeure rights. Therefore, the use of extrinsic evidence to add meaning to the provisions of the contract is inappropriate. *See Huml v. Vlazny*, 293 Wis. 2d 169, 716 N.W.2d 807, 2006 WI 87, ¶ 52 ("In ascertaining the intent of the parties, contract terms should be given their plain or ordinary meaning. If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence").

## **Counts Two and Three: Declared Tonnage/Good Faith**

WEPCO alleges that UP breached the Agreement by failing to provide the necessary railcars and/or locomotives to deliver WEPCO's Annual Declared Tonnage and to meet WEPCO's Monthly Shipping Schedules, resulting in delivery shortfalls during the years 2003, 2004, and 2005. WEPCO also alleges that these failures constitute a breach of UP's duty of good faith and fair dealing. These claims find no support in the plain language of the Agreement.

Under the Agreement, WEPCO was obligated to ship at least one million tons of coal annually in years 2003, 2004 and 2005. Article V. WEPCO was obligated to provide railcars in connection with such shipments unless the parties agreed otherwise. Article

-9-

Case 2:06-cv-00515-RTR   Filed 06/12/08   Page 9 of 13   Document 120

IV.A.1. With rare exception, the parties "agreed otherwise" and UP generally used its own railcars to transport coal under the Agreement.

UP was under an express duty to provide railcars in only three specific circumstances. First, in relation to the backhaul movement as discussed above. Article IV.A.2. It is undisputed that UP discharged this duty.

Second, if WEPCO's railcars were damaged while in UP's possession. Article IV.A.2(D), (F). This provision is not applicable.

Third, if WEPCO invoked the "Service Commitment" provision of Article VII, but only to make up "Deficit Tons" under Article VII(B). Article IV.A.2. It is undisputed that WEPCO did not invoke the Service Commitment provisions of Article VII.

WEPCO focuses on Article VI, which supplies the terms "Declared Tonnage" and "Monthly Shipping Schedule." Article VI provides:

> A. Commencing with calendar year 1999, not later than September 1 during the term of this Agreement, Shipper shall provide to Railroad a declaration of estimated Tons of Coal anticipated to be loaded in the next calendar year by month from each Origin for each Destination ("*Declared Tonnage*"). Shipper's Declared Tonnage shall not exceed the Maximum Tonnage under Article V(C). *Shipper shall attempt to load Coal in approximately even monthly increments within each calendar year*.
>
> B. Not later than the 25th day of each month, Shipper shall provide Railroad it's desired loading schedule for the following calendar month (Monthly Shipping Schedule). *The parties agree to make good faith reasonable efforts to meet the Monthly Shipping Schedule and inform each other of any changes to the Monthly Shipping Schedule as soon as practicable.* If Railroad fails to transport any scheduled Train in a month, Shipper has

-10-

> the option of including such Train(s) in the following month's
> schedule. (Emphases added).

Unlike Article V (minimum amount of coal to be shipped) and Article VII (Service Commitment), Article VI does not impose an obligation to deliver a specific amount of coal. Article VI also does not provide that UP must supply all the cars necessary to move the Declared Tonnages. Under Article VI, the parties merely agreed to "attempt to load Coal in approximately even monthly increments" and to "make good faith reasonable efforts to meet the Monthly Shipping Schedule," which tracked WEPCO's annual "Declared Tonnage."

WEPCO argues that since the parties "otherwise agreed" to the use of UP railcars (Art. IV.A.1) for coal shipments, UP agreed to provide all cars needed to transport WEPCO's Declared Tonnage in accordance with its Monthly Shipping Schedule. This is a leap that cannot logically be made or inferred from the plain language of the Agreement. Even where the parties otherwise agreed to the use of UP railcars, there is nothing in the Agreement that imposes an absolute duty to meet the Declared Tonnages or Monthly Shipping Schedules via Article VI.

WEPCO cites Article IV.H, which provides that UP "shall provide any necessary locomotives and end-of-train devices for transportation under this Agreement and shall perform all repairs and maintenance on such locomotives and end-of-train devices at no charge to Shipper..." The terms "locomotives" and "end-of-train" devices are not specifically defined in the Agreement (Article I, General Definitions), but these terms are distinct from "railroad railcar" (Article I.I) and "shipper railcar" (Article I.J). In any event,

-11-

the general obligation to provide locomotives and other equipment does not impose a specific obligation to deliver a certain amount of coal.

Therefore, Article VI imposes only a general duty to use good faith, reasonable efforts to move the volumes of coal nominated by WEPCO. In response to UP's motion for summary judgment (and in its own motion), WEPCO failed to create a genuine issue of material fact as to whether UP actually violated its duty of good faith. It is not enough for WEPCO to delay this obligation until trial. Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). On the other hand, it is undisputed that UP's actual deliveries exceeded WEPCO's minimum volume commitments under Article V, as well as the minimum volume requirements to the extent that the backhaul arrangement was applicable. Article IVA.2; Article IX.B. Accordingly, the evidence at hand establishes that UP discharged its duty of good faith under the Agreement, and WEPCO provides no evidence to the contrary.

To be more precise, WEPCO moves for summary judgment on the issue of whether UP had an obligation to use good faith reasonable efforts to *provide the necessary equipment, including railcars*, to move the volumes of coal nominated by WEPCO under the agreement. While the Agreement imposed a good faith duty (on *both* parties) to meet the Monthly Shipping Schedule and to satisfy the annual Declared Tonnages, the Agreement clearly does not impose a requirement on UP to use its own railcars towards this end. To the extent that WEPCO seeks to impose this additional, correlative duty upon UP, its motion for summary

-12-

judgment is not well taken. The imposition of extra-contractual duties in this context is preempted by 49 U.S.C. § 10709(b) ("A party to a contract [for rail services] shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract"); *see also Entergy Servs., Inc. v. Union Pac. R.R.*, 99 F. Supp. 2d 1080, 1089 (D. Neb. 2000) ("contract entered into between two parties contains all the duties to which the parties are required to adhere").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. UP's motion for summary judgment [D. 61] is **GRANTED**;

2. WEPCO's motion for partial summary judgment [D. 65] is **DENIED**;

3. All of the motions to exclude expert testimony or reports [D. 62, 63, 64, 67] are **DENIED** as moot;

4. UP's motion to strike WEPCO's reply proposed findings of fact [D. 119] is **DENIED** as moot; and

5. This case is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 11th day of June, 2008.

                                    **SO ORDERED,**

                                    **s/ Rudolph T. Randa**
                                    **HON. RUDOLPH T. RANDA**
                                    **Chief Judge**